# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

   Plaintiff-Appellee,

v

JOSHUA MARTEZ BROWN,

   Defendant-Appellant.

UNPUBLISHED
October 27, 2015


No. 320408
Wayne Circuit Court
LC No. 12-003348-FC

Before: METER, P.J., and WILDER and RONAYNE KRAUSE, JJ.

PER CURIAM.

  A jury convicted defendant of second-degree murder, MCL 750.317, assault with intent to commit murder, MCL 750.83, and possession of a firearm during the commission of a felony, MCL 750.227b. The trial court sentenced defendant to concurrent prison terms of 24 to 50 years for the murder conviction, 14 to 30 years for the assault conviction, and a consecutive two-year term of imprisonment for the felony-firearm conviction. Defendant appeals as of right. We affirm.

  Defendant's convictions arise from a shooting at 19481 West Ferguson Street in Detroit. Several shots were fired into a house occupied by Almanda Talton and her 12-year-old daughter, Kadeja Davis. One of the shots struck Davis in her head, causing her death. Defendant was charged with first-degree premeditated murder, MCL 750.316(1)(a), for the shooting death of Davis, assault with intent to commit murder with respect to Talton, and felony-firearm. The prosecution's theory at trial was that the shooting was related to a dispute over a cell phone that belonged to defendant's mother, Heather Brown, and which Talton was suspected of taking from a tax office where Heather Brown worked. The defense did not dispute that defendant confronted Talton about the cell phone but argued that there was no evidence that he was the person who fired the gunshots.

  Defendant originally stood trial in August and September 2012. However, the trial court ordered a mistrial when the jury was unable to reach a unanimous verdict. At defendant's second trial in November and December 2013, the jury convicted defendant of the lesser offense of second-degree murder and the charged offenses of assault with intent to commit murder and felony-firearm.

## I. ISSUES RAISED IN APPELLANT'S BRIEF ON APPEAL

-1-

## A. SPEEDY TRIAL

Defendant first argues that he was denied a speedy trial because his first trial began more than six months after his arraignment, and the retrial began approximately 21 months after his arraignment. Defendant attributes the most significant delays in the proceedings to the prosecutor and claims that the delays prejudiced him by causing witnesses' memories to fade. However, because defendant neglected to raise the purported speedy trial violation in the trial court, we review his unpreserved claim only to ascertain if any plain error affected his substantial rights. *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999).

We conclude that defendant's substantial rights were not violated in this case. In *People v Borgne*, 483 Mich 178, 196-197; 768 NW2d 290 (2009), the court discussed the four steps used to determine whether an unpreserved claim of error warrants reversal under plain-error review:

> First, there must have been an error. Second, the error must be plain, meaning clear or obvious. Third, the error must have affected substantial rights. This "generally requires a showing of prejudice, i.e., that the error affected the outcome of the lower court proceedings." The defendant bears the burden of establishing prejudice. Fourth, the error must have "resulted in the conviction of an actually innocent defendant" or "seriously affected the fairness, integrity or public reputation of judicial proceedings . . . " [citations omitted]

In this appeal, the defendant has the burden to prove prejudice that affected the outcome of the lower court. *Id.* In this case, the defendant's only argument is that the memories of the witnesses involved faded. Defendant offers no supporting evidence or proof. In *People v Gilmore*, 222 Mich App 442, 462; 564 NW2d 158 (1997), the defendant made the same argument, and this Court stated that "such general allegations of prejudice are insufficient to establish that he was denied his right to a speedy trial." Much like *Gilmore*, the general allegations in this case do not prove that the delay affected the outcome of defendant's trial. Instead, it is a conclusory statement without any support. Therefore, we do not find a sixth amendment violation.

## B. SUFFICIENCY OF THE EVIDENCE

Defendant next argues that the prosecutor introduced insufficient evidence to establish that he fired any gunshots at the victims' house. Defendant contends that the evidence, at most, only proved his presence at the door of the victims' house. This Court reviews de novo a criminal defendant's challenge to the sufficiency of the evidence supporting his conviction. *People v Harverson*, 291 Mich App 171, 175-177; 804 NW2d 757 (2010); *People v Solmonson*, 261 Mich App 657, 661; 683 NW2d 761 (2004). In determining whether sufficient evidence exists "to sustain a conviction, a court must view the evidence in a light most favorable to the prosecution and determine whether any rational trier of fact could have found that the essential elements of the crime were proven beyond a reasonable doubt." *People v Nowack*, 462 Mich 392, 399-400; 614 NW2d 78 (2000) (internal quotation and citation omitted). As the Supreme Court in *Nowack*, *id.* at 400, explained:

The standard of review is deferential: a reviewing court is required to draw all reasonable inferences and make credibility choices in support of the jury verdict. The scope of review is the same whether the evidence is direct or circumstantial. Circumstantial evidence and reasonable inferences arising from that evidence can constitute satisfactory proof of the elements of a crime. [Internal quotation and citation omitted.]

"It is for the trier of fact, not the appellate court, to determine what inferences may be fairly drawn from the evidence and to determine the weight to be accorded those inferences." *People v Hardiman*, 466 Mich 417, 428; 646 NW2d 158 (2002).

A second-degree murder conviction requires proof of "(1) a death, (2) caused by an act of the defendant, (3) with malice, and (4) without justification or excuse." *People v Roper*, 286 Mich App 77, 84; 777 NW2d 483 (2009) (internal quotation and citation omitted). Malice means "the intent to kill, the intent to cause great bodily harm, or the intent to do an act in wanton and willful disregard of the likelihood that the natural tendency of such behavior is to cause death or great bodily harm." *Id*. (internal quotation and citation omitted). The elements of assault with intent to commit murder are (1) an assault, (2) with an actual intent to kill, (3) which, if successful, would make the killing murder. *People v Hoffman*, 225 Mich App 103, 111; 570 NW2d 146 (1997). A felony-firearm conviction requires proof that the defendant possessed a firearm during the commission or attempted commission of a felony. *People v Mitchell*, 456 Mich 693, 698; 575 NW2d 283 (1998). Defendant does not dispute that there was sufficient evidence to establish the commission of these offenses. He contests only the sufficiency of the evidence identifying him as the shooter. A defendant's identity constitutes an element of all criminal offenses. *People v Yost*, 278 Mich App 341, 356; 749 NW2d 753 (2008).

Defendant argues that, at most, the evidence proved only his innocent presence in his mother's red Taurus and his identification as the person who knocked on Talton's front door. We disagree.

Talton testified that on the night of January 31, 2012, shortly after she returned home from her visit to a tax office, she and her daughter were in the living room at her house on West Ferguson. Talton heard the sound of screeching tires near her house, looked out the living room window, and saw a burgundy car drive past. Approximately a minute later, Talton heard knocking on the front door, asked who had knocked, and a man's voice responded, "Jerrod, from the tax place." Talton opened the front door and observed a burgundy car with a spoiler parked in front of her house, the front passenger door of the car was open, two children were in the backseat, and defendant was standing on the front porch, less than a foot away from her. Defendant asked Talton whether she had seen a missing cell phone at the tax office, and Talton advised defendant that she had discovered a phone in the bathroom and returned it to a male office manager. Talton also recounted that as she had begun closing the front door, she observed Heather Brown get out from the driver's side door of the burgundy car and approach Talton's house, while defendant remained standing on the front porch. Talton next heard indistinguishable conversation between defendant and Heather Brown, which was immediately followed by seven or eight gunshots, causing her to hide on the living room floor until the gunshots ceased. Talton conceded that she had closed her front door before the gunfire erupted, that she did not know who fired a gun, and that she never saw a gun or other weapon in

-3-

defendant's possession. However, she explained that defendant had been the closest person to the front door when the shooting started and that she thought defendant was the shooter.

Talton's neighbors, Jovan Bonga and Brittany Henderson, were conversing on the sidewalk in front of Bonga's house when Bonga noticed a red Taurus twice drive down the street. Bonga observed the Taurus parked in front of Talton's house, heard the sound of a door closing on the passenger side of the Taurus closest to Talton's house, and later saw a person of an indeterminate gender standing in the grass of Talton's front yard approximately 10 feet from her house. A few minutes later, he heard two or three gunshots. He then saw in front of Talton's house the gunfire that resulted from three or four more gunshots fired by the same person in Talton's front yard. He then saw the shooter get inside the Taurus on the front passenger side. Bonga added that the gunshots sounded like they all emanated from the same type of gun, and he denied having seen anyone besides the person who stood in Talton's front yard.

Henderson testified that she too saw an older-style burgundy Taurus twice drive past on West Ferguson Street and park in front of Talton's house. Henderson also saw someone standing on the sidewalk in front of Talton's house, who appeared to be a man because of "the way his body was built." Henderson saw fire from a gun that the man in front of Talton's house had pointed directly at the house. She estimated that she heard and saw five gunshots, and the man entered the Taurus's front passenger door before the car drove away. Henderson denied having seen the Taurus's driver leave the car.

Sheila Arrington testified that she learned about Heather Brown's missing cell phone and drove Heather Brown's red Taurus, with Cortland Brown who is Heather Brown's youngest son, to the tax office where Heather Brown worked. Arrington recounted that Heather Brown and Courtland Brown left the tax office together, with Heather Brown driving the Taurus and Arrington and Courtland Brown in the back seat. Defendant later entered the front passenger seat. Heather Brown advised defendant that she could not find her cell phone. The Taurus stopped in front of a house on Ferguson Street. Heather Brown yelled at defendant about her keys. Then Heather Brown and defendant simultaneously left the Taurus, and within the next 10 minutes, while Arrington and Courtland Brown still occupied the back seat of the Taurus, Arrington heard between one and five nearby gunshots. Defendant then reentered the Taurus's front passenger seat, Heather Brown returned to the driver's seat, and the Taurus drove away.

Viewed in a light most favorable to the prosecution, the evidence was sufficient to establish defendant's identity as the shooter beyond a reasonable doubt. The testimony of Talton, Bonga, Henderson, and Arrington agreed that the Taurus had parked directly in front of Talton's house. Talton repeatedly identified defendant as the person who knocked on her door on the evening of January 31, 2012, and the person closest to her house immediately before the gunfire began. Although no one testified to having specifically observed defendant leave the Taurus, Talton's testimony to seeing the front passenger door of the Taurus standing open when defendant appeared on the porch was strong circumstantial evidence that he had occupied that position. Arrington also described defendant's presence in the front passenger seat of the Taurus shortly before the shooting. Although Talton never saw defendant fire gunshots at her house, Bonga and Henderson noticed the sole visible occupant of the Taurus fire the gunshots before reentering the Taurus's front passenger door. Henderson repeatedly opined that the shooter appeared to be a man. To the extent that the jury credited the relevant testimony of these

witnesses, we cannot revisit that determination. *Hardiman*, 466 Mich at 428. Therefore, the record indicates that the evidence was sufficient to sustain a conviction.

## C. FAILURE TO CORRECT TESTIMONY

Defendant next argues that Talton attempted to appear more sympathetic by denying that she purposefully took Heather Brown's cell phone, and the prosecutor's failure to correct this false testimony violated defendant's entitlement to a fair trial. However, because defendant did not object or otherwise raise this issue at trial, it is unpreserved and our review is therefore limited to plain error affecting defendant's substantial rights. *People v Bennett*, 290 Mich App 465, 475; 802 NW2d 627 (2010).

In *People v Gratsch*, 299 Mich App 604, 619-620; 831 NW2d 462 (2013), vacated in part on other grounds, 495 Mich 876 (2013), this Court summarized the following principles that govern a defendant's claim of prosecutorial misconduct premised on the purported introduction of false evidence:

> A defendant's right to due process guaranteed by the Fourteenth Amendment is violated when there is any reasonable likelihood that a conviction was obtained by the knowing use of perjured testimony. Accordingly, a prosecutor has an obligation to correct perjured testimony that relates to the facts of the case or a witness's credibility. When a conviction is obtained through the knowing use of perjured testimony, a new trial is required only if the tainted evidence is material to the defendant's guilt or punishment. So whether a new trial is warranted depends on the effect the misconduct had on the trial. The entire focus of the analysis must be on the fairness of the trial, not on the prosecutor's or the court's culpability. [Internal quotations and citation omitted.]

See also *People v Smith*, ___ Mich ___; ___ NW2d ___ (2015) (Docket No. 148305), slip op at 7. "A prosecutor's capitalizing on the false testimony . . . is of particular concern because it reinforces the deception of the use of the false testimony and thereby contributes to the deprivation of due process." *Id*. at 7-8 (internal quotation and citation omitted).

The prosecutor acknowledges on appeal that Talton falsely denied the suggestion that she stole Heather Brown's cell phone. The prosecutor then introduced Talton's confirmation that a cell phone not belonging to her was found inside her vehicle. The prosecutor also presented testimony by the police officer who found a cell phone "on the rear floorboard behind the driver's seat," introduced the phone into evidence, and elicited police officer testimony that the phone found in Talton's vehicle belonged to Heather Brown. During the prosecutor's closing argument, she acknowledged the falsity of Talton's denial that she had stolen Heather Brown's cell phone by stating, "Now, [Talton] may have stolen that cellphone and lied to you about that, but the real question is whether or not she had a motive to pin something on the defendant."

Although Talton's false testimony to having returned Heather Brown's cell phone related to the facts of this case and Talton's credibility, the prosecutor satisfied her obligation to correct the false testimony. *Gratsch*, 299 Mich App at 619-620. Defendant has failed to substantiate his contention that the prosecutor knowingly introduced false testimony by Talton to obtain his

convictions. *Id*. Furthermore, defendant has failed to show that the purported false testimony affected the outcome of this case. Therefore, defendant's right to a fair trial was not violated.

## D. DENIAL OF MOTION TO SUPPRESS

Defendant next argues that because the police did not possess a search warrant when an officer arrested him, searched him, and seized his cell phone, the trial court erred in failing to suppress the cell phone and any evidence derived from it. The parties agree that prior to the trial they contested the validity of the police seizure of defendant's cell phone at the time of his arrest, and the trial court ruled that the seizure was constitutionally sound. However, the record does not reflect that defendant objected to the admissibility of the cell phone's contents.

This Court reviews de novo issues involving the application of underlying law, including the application of constitutional provisions. *People v Slaughter*, 489 Mich 302, 310; 803 NW2d 171 (2011). The Court reviews for clear error a challenge to the trial court's "factual findings at a suppression hearing." *Id*. We review for plain error unpreserved claims of error. *Carines*, 460 Mich at 763-764.

Both US Const, Am IV, and Const 1963, art 1, § 11, protect people against unreasonable searches and seizures. *Slaughter*, 489 Mich at 310-311. A search that occurs without a warrant qualifies as unreasonable, unless the circumstances surrounding the search or seizure establish the existence of probable cause and an exception to the warrant requirement. *People v Barbarich*, 291 Mich App 468, 472; 807 NW2d 56 (2011). In *People v Chapman*, 425 Mich 245, 250-251; 387 NW2d 835 (1986), the Michigan Supreme Court summarized the following regarding searches incident to lawful arrests:

> The exception to the search warrant requirement of the Fourth Amendment for searches conducted incident to a lawful custodial arrest, was addressed by the United States Supreme Court in *United States v Robinson*, 414 US 218; 94 S Ct 467; 38 L Ed 2d 427 (1973). The Court, in *Robinson*, explained that "[i]t is the fact of the lawful arrest which establishes the authority to search," and held that "in the case of a lawful custodial arrest a full search of the person is not only an exception to the warrant requirement of the Fourth Amendment, but is also a 'reasonable' search under that Amendment." *Id*. at 235. The Court reasoned that because the lawful arrest "is a reasonable intrusion under the Fourth Amendment, . . . a search incident to the arrest requires no additional justification." *Id*. The Court emphasized that although "the authority to search [in such situations is] based upon the need to disarm and to discover evidence, [it] does not depend on what a court may later decide was the probability in a particular arrest situation that weapons or evidence would in fact be found upon the person of the suspect." *Id*.

> In *Robinson*, the Court held that the permissible scope of a search incident to a lawful custodial arrest extends to containers found within the "control area" of the arrestee . . .

-6-

We conclude that the trial court correctly reversed its initial ruling to suppress a cell phone recovered inside a pair of pants in defendant's bedroom[1]. Defendant's suggestion that no search warrant supported the cell phone seizure ignores that a search warrant existed for the Chatham Street residence where the police arrested defendant on February 1, 2012, and the search warrant expressly referenced electronic storage media, including cell phones. Further, defendant does not specifically contest that probable cause existed to support the search warrant. Even without considering the inevitable discovery doctrine invoked by the trial court[2], the court correctly found the cell phone within the scope of an applicable search warrant. *People v King*, 297 Mich App 465, 475; 824 NW2d 258 (2012) (affirming a correct result that a trial court reached for a wrong reason).

Defendant also complains that the police undertook a warrantless review of the contents of the cell phone found inside the pants in his Chatham Street bedroom. A Detroit police sergeant and the officer in charge of the shooting investigation testified that he had obtained a search warrant for the cell phone recovered from the pants in defendant's Chatham Street bedroom and took the phone to the "Michigan State Police forensic lab and attempted to get a forensic dump of the phone." The sergeant explained that the "Michigan State Police weren't able to access the phone because the SIM card was missing and because there was a lock on the phone, a numeric lock."

Defendant's argument ignores that Sergeant Brian Bowser testified that he had obtained a search warrant before the police attempted to search the contents of this phone and that they failed to recover any information from it. The prosecutor thus never referenced the contents of this phone during the trial. The United States Supreme Court's decision in *Riley v California*, ___ US ___; 134 S Ct 2473; 189 L Ed 2d 430 (2014), does not apply to the factual circumstances of this case.[3]

## II. DEFENDANT'S STANDARD 4 BRIEF

---

[1] At the time of arrest, defendant was only wearing boxer shorts. He asked the police if he could have pants and pointed to the pants in which the cell phone was. The police agreed and found the cell phone when they searched the pants prior to handing them to defendant. It is clear that searching the pants in this case falls within the incident to lawful arrest exception. The pants were soon to be within the control area of defendant and thus required a search to ensure the safety of the officers. *Chapman*, 425 Mich 245.

[2] If the evidence would have been inevitably obtained, then there is no rational basis for excluding the evidence from the jury. *People v. Stevens*, 460 Mich 626, 637; 597 NW2d 53,(1999) disapproved of by Lee v State, 774 A.2d 1183 (Md. Spec. App. 2001). In this case, the cell phone would have been discovered upon the subsequent search of the home where defendant was arrested.

[3] The issue presented in *Riley* concerned "whether the police may, without a warrant, search digital information on a cell phone seized from an individual who has been arrested." 134 S Ct at 2480.

Defendant raises additional issues in a pro se supplemental brief, filed pursuant to Supreme Court Administrative Order No. 2004-6, Standard 4, none of which have merit.

## A. TIMELY ARRAIGNMENT

Defendant maintains that the police violated his constitutional right to a timely arraignment, which must occur no later than 48 hours after his warrantless arrest. He also contends that before his arraignment the police subjected him to multiple coercive interrogations intended to obtain his incriminating statements. Defendant neglected to raise any challenge to an improper delay in his arraignment in the trial court. Accordingly, this issue qualifies as unpreserved for appellate review. *People v Cain*, 299 Mich App 27, 48; 829 NW2d 37 (2012), rev'd in part on other grounds 495 Mich 874 (2013). This Court reviews this unpreserved issue only to determine if any plain error affected defendant's substantial rights. *Id*.

Defendant did not substantiate his assertion that a delay in his arraignment led directly to the introduction of inadmissible and prejudicial evidence against him. In *Cain*, *id*. at 49-50, this Court summarized the relevant principles concerning a defendant's undue delay in his arraignment:

> An individual who has been arrested must be brought before a magistrate for arraignment "without unnecessary delay . . . " MCL 764.13; MCL 764.26. When an individual is arrested without a warrant, a prompt arraignment is particularly important because it provides a judicial determination of probable cause. A delay of more than 48 hours after arrest is presumptively unreasonable unless there are extraordinary circumstances. The exclusionary rule applies whenever a statutorily unlawful detention has been employed as a tool to directly procure any type of evidence from a detainee. However, while an improper delay in arraignment may necessitate the suppression of evidence obtained as a result of that delay, the delay does not entitle a defendant to dismissal of the prosecution. [Internal quotations and citations omitted.]

A post-arrest delay that exceeds more than 48 hours prior to the arraignment qualifies as presumptively unreasonable. *Cain,* 299 Mich App 27. However, even if an excessive delay intervenes between a warrantless arrest and an arraignment, a defendant must identify with specificity the evidence that the police purportedly obtained directly from the unlawful detention. *Id*. When the defendant fails to identify any evidence the trial court could have suppressed as directly resulting from an undue delay, "the delay in [the] defendant's arraignment was not outcome determinative, and he is not entitled to relief." *Id*. at 50.

The parties agree that defendant's arraignment exceeded the generally reasonable period of 48 hours after his arrest. However, like the defendant in *Cain*, *id*. at 48-49, defendant fails to substantiate that an unreasonable postarrest delay directly led to the admission of any specific evidence that prejudiced his substantial rights. Therefore, this claim is without merit.

## B. INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant finally urges that trial counsel was ineffective for failing to challenge the felony complaint on the basis that it did not set forth any factual support identifying defendant as

the shooter. Defendant maintains that the insufficient complaint resulted in the trial court's invalid exercise of jurisdiction over him. Defendant also asserts that the trial court should have suppressed the evidence that the police secured after defendant's unlawful arrest. However, because defendant did not pursue an ineffective assistance of counsel claim in the trial court, our review of this issue "is limited to mistakes apparent on the record." *People v Rodriguez*, 251 Mich App 10, 38; 650 NW2d 96 (2002).

To establish ineffective assistance of counsel, defendant must demonstrate that his counsel's performance fell below an objective standard of reasonableness and that counsel's representation so prejudiced defendant that he was deprived of a fair trial. *People v Pickens*, 446 Mich 298, 302-303; 521 NW2d 797 (1994). With respect to the prejudice aspect of the test for ineffective assistance, defendant must demonstrate a reasonable probability that but for counsel's errors the result of the proceedings would have differed. *Id*. at 312, 326-327; *People v Rodgers*, 248 Mich App 702, 713-714; 645 NW2d 294 (2001).

Defendant has failed to substantiate ineffective assistance of counsel. A criminal complaint serves to "initiate[] the judicial phase of the prosecution and provide[] a basis for the issuance of an arrest warrant." *People v Burrill*, 391 Mich 124, 128; 214 NW2d 823 (1974). Concerning the substance of a criminal complaint, MCR 6.101 provides:

> (A)    A complaint is a written accusation that a named or described person has committed a specified criminal offense. The complaint must include the substance of the accusation against the accused and the name and statutory citation of the offense.

> (B)    The complaint must be signed and sworn to before a judicial officer or court clerk . . .

The complaint in this case contained the following details: (1) the date of the offenses, January 31, 2012; (2) the location where the offenses occurred, 19481 Ferguson Street in Detroit; (3) the charge of first-degree premeditated murder, MCL 750.316(1)(a), for defendant's killing of Kadeja Davis "deliberately, with the intent to kill, and with premeditation"; (4) the charge of assaulting Talton with the intent to kill her; (5) the count alleging defendant's violation of the felony-firearm statute by using a handgun during his killing of Davis and assault of Talton; and (6) an assistant prosecutor's signature based on "info[rmation] and belief." We conclude that the complaint satisfied the requirements in MCR 6.101(A) and (B), and served to properly commence the judicial proceedings against defendant. *Burrill*, 391 Mich at 128; *Cain*, 299 Mich App at 52.

With respect to the role of the complaint as the basis for an arrest warrant, MCL 764.1(1) provides that a judge or magistrate may issue a felony warrant for a person's arrest only if the prosecutor has filed a signed authorization "allowing the issuance of the warrant." Pursuant to MCL 764.1a(1), a magistrate may "issue a warrant upon presentation of a proper complaint alleging the commission of an offense and a finding of reasonable cause to believe that the individual accused in the complaint committed that offense." According to MCL 764.1a(2), a reasonable cause finding may rest on "1 or more of the following: . . . (a) Factual allegations . . . contained in the complaint[,]" "(b)    The complainant's sworn testimony[,]" "(c)    The

complainant's affidavit[,]" or "(d) Any supplemental sworn testimony or affidavits of other individuals presented by the complainant or required by the magistrate." The Michigan Court Rules similarly authorize the issuance of an arrest warrant "if presented with a proper complaint and . . . the court finds probable cause to believe that the accused committed the alleged offense." MCR 6.102(A). The court rules also specify that a probable cause finding can "be based on hearsay evidence . . ." MCR 6.102(B).

The February 4, 2012 felony warrant contained information identical to the allegations in the complaint and the following assertion immediately above the magistrate's signature: "Upon examination of the complaining witness, there is probable cause to believe that the offense charged was committed and the Defendant committed the offense." The allegations in the complaint and warrant formed a reasonable basis for a belief that defendant committed the charged offenses. *Cain*, 299 Mich App at 52.

But even assuming that the complaint contained inadequate detail to justify the issuance of an arrest warrant, defendant would have no right to relief. As explained in *Burrill*, 391 Mich at 132-134:

> While the inadequacies of the complaint—the conclusory form of the allegations and the failure to state the underlying or operative facts—and the magistrate's failure to examine witnesses did not vitiate the efficacy of the complaint as the document initiating judicial proceedings or affect the jurisdiction of the court, it is manifestly true that the arrest warrant, issued on the basis of the complaint, was invalid.

> \* \* \*

> However, contrary to Burrill's contentions, the invalidity of the arrest warrant did not oust the circuit court of jurisdiction. The sole sanction imposed by the United States Supreme Court for the invalidity of an arrest warrant has been the suppression of evidence obtained from the person following his illegal arrest.

> The Court has consistently held that a court's jurisdiction to try an accused person cannot be challenged on the ground that physical custody of the accused was obtained in an unlawful manner.

> \* \* \*

> . . . [W]e conclude that the invalidity of the arrest warrant in this case did not affect the court's jurisdiction to try Burrill . . .

In *People v Mayberry*, 52 Mich App 450, 451-452; 217 NW2d 420 (1974), this Court approvingly cited *Burrill* in rejecting a defendant's suggestion that "a conclusory complaint which fails to identify sources of information . . . divests the court of jurisdiction to try the offense." This Court also held that "[b]ecause an arrest warrant is not required, when an invalid arrest is obtained, the question becomes whether the officer had probable cause to arrest. Since

-10-

the police had probable cause to arrest in the instant case, defendant's allegation of error is without merit." *Id*. at 451.

Because the complaint and warrant in this case contained the proper information, defense counsel possessed no basis for a valid objection to the complaint or warrant. *People v Mack*, 265 Mich App 122, 130; 695 NW2d 342 (2005) (noting that counsel need not raise a meritless objection). Furthermore, we conclude that the failure to object to the allegedly conclusory complaint did not prejudice defendant because it had no impact on the trial court's "jurisdiction to try the offense." *Mayberry*, 52 Mich App at 451.

Affirmed.

/s/ Patrick M. Meter
/s/ Kurtis T. Wilder
/s/ Amy Ronayne Krause